## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| Gaylon Cromeens,<br><br>　　　　Plaintiff,<br><br>v.<br><br>Union Pacific Railroad Co.,<br><br>　　　　Defendant. | **CASE NO: 8:23-CV-00234-JFB-JMD**<br><br>**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

## <u>INTRODUCTION</u>

Union Pacific's subject matter jurisdiction arguments are inappropriate and wholly inapplicable as they rely on Union Pacific's unsupported statements that it revoked Plaintiff Gaylon Cromeens's ("Cromeens" or "Plaintiff") Federal Railroad Administration ("FRA") engineer certification. Union Pacific did not revoke Cromeens's certification, instead it imposed its own standard permanent work restrictions on him. *See* Plaintiff's Responsive Statement of Facts in Opposition to Defendant's Motion for Summary Judgment, ¶¶ 50, 64, 65, 168, 172, 238 (hereinafter PSOF). In fact, Cromeens remained certified for several years ***after*** Union Pacific imposed permanent work restrictions on him. *Id.* ¶¶ 65, 172, 238.

Instead, Cromeens directly challenges Union Pacific's permanent restrictions in his Complaint: "Union Pacific discriminated against Cromeens on the basis of disability by . . . imposing permanent work restrictions on him that disqualified him from his position because of a disability." *See* ECF No. 1, at ¶ 60. Union Pacific's work restriction provided that Cromeens was prohibited from "1. Operation of company Vehicles/on-track or mobile equipment/forklifts"; "2. Operation of cranes, hoists, or machinery"; "3. Work on or near moving trains, freight cars or locomotives"; and "4. Work at unprotected heights over 4 feet above the work surface". PSOF, ¶

170. These restrictions go far beyond a revocation of FRA engineer certification and Union Pacific's shifting of the goal posts does not support summary judgment.

Despite Union Pacific's admission in this case that the Court has subject matter jurisdiction over claims brought under the Americans with Disabilities Act (ADA) pursuant to 28 U.S.C. § 1331 and that venue is proper, Union Pacific now argues this Court lacks subject matter jurisdiction. *See* ECF No. 6, ¶¶ 4-6. To make this argument, Union Pacific erroneously relies on a Federal Railroad Administration (FRA) formal administrative procedure for when a person "believes that a railroad incorrectly determined that he or she failed to meet the certification requirements of this part…." *See* ECF No. 55, at 6 citing 49 C.F.R. § 240.401(a). However, even if Union Pacific had revoked Cromeens's certification, the FRA's administrative review process is explicit that it is strictly limited to "whether denial or revocation of certification or recertification was improper **under this part**. . . [t]he Board **will not** otherwise consider the propriety of a railroad's decision…." 49 C.F.R. § 240.405(K). If an engineer does not meet the FRA prescribed visual acuity threshold certification requirements, a railroad medical examiner still may independently certify a locomotive engineer. *See* 49 C.F.R. § 240.121(e). As discussed below, this Court has subject matter jurisdiction over this case because a railroad's independent certification is not reviewable by the FRA. Union Pacific's attempts to dismiss this case should be denied because it is based on misleading and disputed facts regarding Cromeens's certification and an attenuated theory of jurisdiction contrary to the position of both the Equal Employment Opportunity Commission (EEOC) and the FRA.

The next portion of Union Pacific's motion makes several varying attempts designed to improperly shift its direct threat affirmative defense burden onto Plaintiff. This Court has already dealt with many of these issues and has concluded that "the question of whether [an employee]

can perform his job safely, so as to be qualified for the position is not part of a plaintiff's prima facie case but goes to whether the Railroad can prevail on its direct threat defense." *See Sanders v. Union Pac. R.R. Co.,* 2021 WL 4783629, at *8-9 (D. Neb. Oct. 7, 2021)). From there, "the employer bears the burden of proof [on] direct threat defense." *E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571-72 (8th Cir. 2007). Union Pacific's motion should be denied because it is well-established that qualification standards related to safety go to its direct threat affirmative defense and Union Pacific cannot establish its direct threat defense.

The remaining of Union Pacific's motion should be denied because Cromeens has established each of the elements of his prima facie case under both his 42 U.S.C. § 12112(a) and § 12112(b) disparate treatment claims. The evidence shows that Union Pacific imposed its standard "sudden incapacitation" restrictions on Cromeens that Union Pacific placed on employees "no matter what their job was." PSOF ¶ 175. Further, Union Pacific has directly admitted these restrictions were placed on Cromeens due to his disability. *Id.* ¶ 150. Even if this Court were to determine there was no direct evidence of discrimination, Cromeens is more than able to raise a jury question on pretext.

## **STANDARD OF REVIEW**

Summary judgment is proper only when the record shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The burden is on the moving party to demonstrate the absence of a material factual dispute. *Celotex*, 477 U.S. at 323. The Court must view the record in the light most favorable to the non-moving party and must give the non-moving party "the benefit of all reasonable inferences that may be drawn from the evidence." *Maitland v. Univ. of Minn.*, 155 F.3d 1013, 1015 (8th Cir. 1998).

3

When a defendant moves for summary judgment on an affirmative defense for which it will bear the burden of proof at trial, the summary judgment burden is higher. *See Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). Because of this, "summary judgments in favor of parties who have the burden of proof are rare, and rightly so." *Turne v. Ferguson*, 149 F.3d 821, 824 (8th Cir. 1998). Here, Union Pacific bears this higher burden on its "direct threat" affirmative defense. *E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571-72 (8th Cir. 2007) ("the employer bears the burden of proof [on] direct threat defense.").

## ARGUMENT

I. **SUBJECT MATTER JURISDICTION EXISTS AND CROMEENS CAN ONLY SEEK MEANINGFUL REVIEW OF UNION PACIFIC'S DISABILITY DISCRIMINATION WITH THIS COURT**

Union Pacific argues that Plaintiff challenges "final agency action", however, Plaintiff's claim is not a challenge to a final agency action, rather, that after 17 years of ably and safely performing his job duties, Union Pacific unlawfully *discriminated* against him, a qualified individual, on the basis of disability by, among other things, removing him from services and *imposing permanent work restrictions* on him that disqualified him from his position because of a disability. *See* ECF No. 1, at ¶¶ 58-60 (emphasis added). Cromeens further claims that Union Pacific discriminated against him on the basis of disability by using *facially discriminatory qualification standards* as part of its Fitness-For-Duty program that are intended to screen out individuals with a disability, and which did screen out Cromeens. *Id.* ¶ 65.

A. **The FRA's Locomotive Engineer Certification Requirements for Visual Acuity are Strictly Limited to the Acuity Thresholds and Issues of Discrimination are Outside the Scope of FRA Review**

Cromeens's claim is not about revocation of FRA certification, but rather the discriminatory permanent work restrictions Union Pacific imposed on him. In fact, Union Pacific

4

did not even revoke Cromeens's FRA certification. *See* PSOF ¶¶ 50, 64, 65, 168, 172, 238. The regulatory scheme raised by Union Pacific is explicit that the FRA's administrative review is strictly limited to "whether denial or revocation of certification or recertification was improper ***under this part***. . . [t]he Board ***will not*** otherwise consider the propriety of a railroad's decision…." 49 C.F.R. § 240.405(K) (emphasis added). Contrary to Union Pacific's argument, the FRA directly recognizes that "[i]ssues of discrimination or of disparate treatment are outside of the Board's authority to review." *See* Cramer Decl. Ex. 18, Decision Concerning National Passenger Railroad Corporation's Denial of Mr. B. M. Peltz's Conductor Certification (Nov. 9, 2016), at 2, 4, https://www.regulations.gov/document/FRA-2015-0090-0004 (citing 49 C.F.R. § 242.505(k). Further, "[a]bsent a violation of a mandated and enforceable standard, the agency or this tribunal should not be inclined to substitute the railroad's and its medical examiner's discretionary choice or opinion with its own." *See* Cramer Decl. Ex. 19, FRA – Conductor Certification Cases (Sep. 10, 2020), at 16, https://www.regulations.gov/documents/FRA-2014-0108-0033.

FRA regulations indeed prescribe a minimum visual acuity requirement. *See* 49 C.F.R. § 240.121(c)(1). However, if a person does not meet that visual acuity requirement, the FRA gives the railroad discretion to determine whether it will certify an employee. *See* 49 C.F.R. § 240.121(e) ("If, after consultation with one of the railroad's designated supervisors of locomotive engineers, the medical examiner concludes that, despite not meeting the threshold[s] in paragraphs (c) and (d) of this section, the person has the ability to safely operate a locomotive, the person may be certified as a locomotive engineer….").

Even if Union Pacific had revoked Cromeens's FRA certification, that revocation decision is made by a railroad's medical examiner and is not based on any mandated and enforceable standard. The FRA does not review a medical examiner's discretionary decision, and the FRA has

5

no authority to review issues of discrimination. Cromeens's ADA claims are properly before this Court because issues of discrimination are outside the scope of FRA review and the ADA squarely places jurisdiction with federal district courts. 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

### B. A Railroad Medical Examiner's Discretion is Not Final Agency Action and is Not Reviewable Under the Administrative Review Process

Union Pacific incorrectly attempts to shield itself from complying with the ADA by labeling its independent and discretionary Fitness-for-Duty program and medical decisions as "final agency action." *See* ECF No. 55, at 8. It is nothing of the sort and concluding otherwise would eliminate any meaningful review of a railroad's discretionary decision-making as the FRA in no way considers whether an action was discriminatory. Even if Union Pacific was correct, the Supreme Court has "consistently held that 'the mere fact that a business is subject to state regulation does not by itself convert its action into that of the State.'" *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52, S.Ct. 977 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 359, 95 S.Ct. 449, 42, L.Ed.2d 477 (1974).

The FRA regulation is explicit that administrative review is limited to whether the certification decision was improper "under this part". 49 C.F.R. § 240.405(k). The only visual acuity requirement prescribed "under this part" is found at subsection 49 C.F.R. § 240.121(c).[1] Union Pacific represents that its "conduct giving rise Cromeens' claims arose exclusively from its application of the FRA regulation imposing criteria for vision acuity for locomotive engineers found in 49 C.F.R. § 240.121." *See* ECF No. 55, at 10. However, Union Pacific cites no evidence

---

[1] "For distant viewing either (i) Distant visual acuity of at least 20/40 (Snellen) in each eye without corrective lenses or (ii) Distant visual acuity separately to at least 20/40 (Snellen) with corrective lenses and distant binocular acuity of at least 20/40 (Snellen) in both eyes with or without corrective lenses."

to support this claim, and Union Pacific has not introduced any admissible, properly authenticated evidence showing that it revoked Cromeens's FRA certification. *See* PSOF, at ¶ 64.

Union Pacific misconstrues Plaintiff's claim in representing that "Cromeens is challenging the application of these regulation to him and seeks an order requiring Dr. Holland to issue him a locomotive engineer certification." *See* ECF No. 55, at 10. Cromeens is not challenging the visual acuity regulation or whether he met the minimum visual acuity standard under the regulation. Nor is Cromeens challenging whether Union Pacific's medical examiner should have had the discretion to revoke certification. Instead, Cromeens challenges the propriety of the discriminatory permanent work restrictions Union Pacific imposed on him, claiming that Union Pacific violated the ADA.

### C. The Hobbs Act Does Not Apply Because Cromeens Does Not Challenge Administrative Procedure or the FRA's Regulatory Scheme

Union Pacific incorrectly invokes the Hobbs Act, which is exclusive to challenging final agency action. As discussed above, the discretionary decision of Union Pacific's medical examiner and Union Pacific's standard permanent work restrictions imposed on Cromeens are not final agency action. Union Pacific is misguided in its reliance on *Daniels v. Union Pacific*, 530 F.3d 936 (2008). In *Daniels*, several plaintiffs challenged a procedural issue regarding whether the employer was required to hold a hearing before denial of their engineer certification. As noted in *Daniels*, "[b]efore revoking an engineer's certification, the railroad must 'provide notice of the reason for the suspension, the pending revocation, and an opportunity for a hearing before a presiding officer other than the investigation officer.'" *Id.* at 938, quoting 49 C.F.R. 240.307(b). Daniels petitioned for review to the Locomotive Engineer Review Board (LERB) because Union Pacific did not hold a hearing. *Id.* at 939.

Instead of appealing the LERB's decision to the FRA Administrator, Daniels filed a *Bivens* action in federal district court challenging whether Union Pacific, the FRA, and the LERB followed the procedures governing certification. *Id.* at 942. The Court held that Daniels was challenging "the standards and procedures governing certification and the revocation of certification are codified in federal regulations." *Id.* Unlike Cromeens, the challenge in *Daniels* was of an explicit regulatory procedure to which the FRA had provided interpretation. *Id.* ("Union Pacific's denial of a hearing is thus based on its interpretation of the FRA regulations, an interpretation the FRA has upheld"). On the other hand, the FRA has not interpreted the discretionary decision-making of a railroad's medical examiner, but instead once a retest is requested, "the control of the process transfers to the railroad." FRA – Conductor Certification Cases (Sep. 10, 2020), at 16, gttps://www.regulations.gov/documents/FRA-2014-0108-0033. An FRA Administrative Hearing Officer concluded that its likely the FRA regulation provides railroads with discretionary decision making because a railroad has "authority over its own personnel decisions absent applicable law or contractual agreement…." *Id.* In other words, a railroad's discretion is not made under the authority of the FRA, rather its own authority.

The Hobbs Act does not apply to the work restrictions Union Pacific placed on Cromeens because the regulation provides discretion in the railroad and there is no regulatory basis or agency action to challenge that discretion: "[t]he discretion afforded to the railroad applies to both the retest's type and decisional conclusion, as there is nothing else in the rule or guidance clearly suggesting otherwise." *Id.* Further, "[a]bsent a violation of a mandated and enforceable standard, the agency or this tribunal should not be inclined to substitute the railroad's and its medical examiner's discretionary choice or opinion with its own." *Id.*

8

Put plainly, the issue in *Daniels* dealt with an administrative procedure explicitly provided for by regulation that had been interpreted by the FRA. On the other hand, the FRA does not provide an explicit procedure, mandated and enforceable standard, nor any interpretation for a medical examiner's decision pursuant to 49 C.F.R. § 240.121(e). Nevertheless, this case is a question of the permanent work restrictions Union Pacific imposed on Cromeens—not certification. The FRA regulations are direct that the FRA administrative review "will not consider whether the railroad properly applied its own more stringent requirements." 49 C.F.R. 242.505(k). Because the FRA will not substitute a railroad's discretion for its own nor question the propriety of a railroad's decision, there is no meaningful review of Union Pacific's work restrictions. Therefore, the Hobbs Act does not apply.

Also inapplicable to Cromeens's case, Union Pacific points to *Carpenter v. Dept. of Trans.*, 13 F.3d 313 (9th Cir. 1994). The issue in *Carpenter* was whether a Federal Highway Administration regulation requiring minimum vision acuity thresholds violated the Rehabilitation Act. *Id.* at 314. This challenge was to the regulation itself—as noted by Union Pacific, "the Hobbs Act grants exclusive jurisdiction over claims seeking to, among other things, determine the validity of rule, regulation, or orders of the FHA and that grant overrides general grants of jurisdiction to district courts." ECF No. 55, at 9. Cromeens does not challenge the validity of the FRA's minimum visual acuity thresholds, he does not challenge the FRA regulation itself, nor does Cromeens challenge an order of the FRA. Instead, Cromeens challenges Union Pacific's permanent work restrictions. Simply because the FRA permits discretionary decision-making does not make Union Pacific's discretionary decision-making final agency action.

**D. Union Pacific Makes No Direct Claim that its Permanent Work Restrictions Imposed on Cromeens are Part of Any So-Called Locomotive Engineer Certification Program and Any So-Called Program is Limited to the Criteria Established in § 240.121**

Union Pacific indirectly labels its medical examiner's discretionary decision-making as "final agency action" and claims that Cromeens is "challenging the FRA's approval of Union Pacific's locomotive engineer certification program." ECF No. 55, at 12. Union Pacific alludes to the existence of an engineer certification program by quoting caselaw that provides "[T]he [FRA] has promulgated regulations requiring '[e]ach railroad' to 'have in effect a written program for certifying the qualifications of" both engineers and conductors…." ECF No. 55, at 12, quoting *Bhd. Of Locomotive Engineers & Trainmen v. Fed. R.R. Admin.*¸ 972 F.3d 83, 116 (D.E. Cir. 2020). However, Union Pacific makes no claims that the permanent work restrictions it imposed on Cromeens were part of its locomotive engineer certification program. In fact, Union Pacific has not introduced nor supported its motion with any so-called "FRA-approved locomotive engineer certification program". PSOF, at ¶ 64. Instead, Union Pacific labels the actions it took against Cromeens as a "fitness-for-duty determination". *Id.* at ¶¶ 39, 45, 120, 167, 230, 232.

Nevertheless, even if there were an "FRA-approved locomotive engineer certification program", such program is limited to "[a] procedure for evaluating visual and hearing acuity that complies with the criteria established in § 240.121." See 49 C.F.R. § 240.101(c)(4). As addressed earlier, the only criteria provided in 49 C.F.R. § 240.121 is the visual acuity thresholds. From here, as discussed previously, if the "medical examiner concludes that, despite not meeting the threshold[s] in paragraphs (c) and (d) of this section, the person has the ability to safely operate a locomotive, the person may be certified as a locomotive engineer" and "[t]he Board will not otherwise consider the propriety of a railroad's decision…." 49 C.F.R. § 240.405(k).

Union Pacific's claim that its work restrictions were based on final agency action is completely unsupported. On summary judgment evidence must be viewed in the light most favorable to the nonmoving party. When there simply is no evidence to demonstrate the mere existence of an "FRA-approved locomotive engineer certification program", let-alone whether Union Pacific's permanent work restrictions were made pursuant to that engineer certification program, it is clear that Union Pacific's revocation was ***not*** made in accordance with this non-existent certification program. Therefore, Union Pacific falls woefully short of meeting the standard for summary judgment with its final agency action argument.

## II.  CROMEENS CAN ESTABLISH § 12112(A) DISPARATE TREATMENT

### A. Cromeens Can Establish His Prima Facie Case and That He Is A Qualified Individual

Union Pacific argues that Cromeens is not qualified as defined under the ADA, "because he was unable to maintain FRA locomotive engineer certification." ECF No. 55, at 18. First, as discussed in detail above, Cromeens did maintain his locomotive engineer certification, so Union Pacific's argument that Cromeens was not "qualified" under that analysis is without merit. Second, Union Pacific's position is that it had a "**SAFETY-RELATED** reason for revoking his FRA certification…." *Id.* (emphasis added). ***This argument is exclusively related to Union Pacific's direct threat defense***, not the qualified individual element.

Despite all of Union Pacific's legal acrobatics across two-dozen pages of briefing, "the question of whether [an employee] can perform his job safely, so as to be qualified for the position is not part of a plaintiff's prima facie case but goes to whether the Railroad can prevail on its direct threat defense." *See Sanders v. Union Pac. R.R. Co.*, 2021 WL 4783629, at *8-9 (D. Neb. Oct. 7, 2021). Requiring Cromeens to prove that he can safely perform the essential functions of his job to establish that he is qualified would improperly shift the direct threat burden to Cromeens and

11

entirely relieve Union Pacific from its burden of establishing its direct threat defense. The Eighth Circuit has definitively held that defendants hold the burden to prove the direct threat defense. *E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007). Union Pacific points to several plainly inapplicable cases in its attempt to change the established legal framework for ADA cases—Plaintiff addresses those below:

          1.   *Harris v. P.A.M Transport* does not apply

The issue in *Harris v. P.A.M. Transp., Inc.*, 339 F.3d 635 (8th Cir. 2003) was "whether Harris's failure to seek relief under DOT procedures requires dismissal of his ADA claim." This issue related to a Department of Transportation regulation—**not FRA**—that explicitly provides for administrative review when "there is a disagreement between the medical examiner for the driver and the medical examiner for the motor carrier concerning the driver's qualifications." 49 C.F.R. § 391.47(b)(2). Union Pacific makes no claim that such a procedure exists under FRA regulation, nor that any such procedure is applicable to Cromeens—all Union Pacific does is draw a comparison that "the FRA, like the DOT regulations governing commercial drivers, provides appeal procedures…." ECF No. 55, at 15. This is like comparing apples to airports. Put plainly, DOT regulations related to job qualifications differ from those of the FRA. Where the DOT's regulations at the time of *Harris* provided an administrative procedure for a disagreement between a driver's medical examiner and that of a motor carrier, no such procedure exists under current FRA regulation. As addressed thoroughly above, if an engineer does meet the FRA visual acuity requirements, it is then the railroad's medical examiner who determines whether an engineer may be certified despite not meeting those visual acuity requirements. *See* 49 C.F.R. § 240.121(e). Where the DOT regulations provided a dispute process, the FRA regulations provide that "control of the process transfers to the railroad" and "[a]bsent a violation of a mandated and enforceable

standard, the agency or this tribunal should not be inclined to substitute the railroad's and its medical examiner's discretionary choice or opinion with its own." FRA – Conductor Certification Cases (Sep. 10, 2020), at 16, gttps://www.regulations.gov/documents/FRA-2014-0108-0033.

### 2. *Albertson's does not apply*

Next, Union Pacific erroneously relies in *Kirkingburg v. Albertson's, Inc.*, 527 U.S. 555 (1999). The issue in *Kirkingburg* revolves around a since-amended Department of Transportation (DOT) vision standard for truck drivers—not the current FRA regulation for locomotive engineers. *Kirkingburg* simply does not apply because it is discussing a completely different regulation under a different regulatory scheme. Unlike the FRA regulation for locomotive engineers today,[2] the DOT vision standards[3] at question in *Kirkingburg* **did not provide an exception** for employers to provide discretionary decision making related to certification. Instead, the DOT regulations prescribed "binding standards." *Kirkingburg*, at 2173. The Supreme Court explained the difference between binding standards and standards created by an employer:

> It is crucial to its position that Albertson's here was not insisting upon a job qualification ***merely of its own devising, subject to possible question about genuine appropriateness and justifiable application to an individual for***

---

[2] "***Except as provided in paragraph (e)***, each person shall have visual acuity that meets or exceeds the following thresholds…." 49 C.F.R. § 240.141(c). ***Paragraph (e) provides:*** "If, after consultation with one of the railroad's designated supervisors of locomotive engineers, the medical examiner concludes that, ***despite not meeting the threshold(s) in paragraphs (c)*** and (d) of this section, the person has the ability to safely operate a locomotive, ***the person may be certified*** as a locomotive engineer and such certification conditioned on any special restrictions the medical examiner determines in writing to be necessary." 49. C.F.R. § 240.141(e).

[3] *See* Ex. 20. "A person ***shall not*** drive a commercial motor vehicle ***unless he/she is physically qualified to do so….***" 49 C.F.R. §391.41(a) (1998) (emphasis added). "A person is physically qualified to drive a commercial motor vehicle if that person—(10) Has distant visual acuity of at least 20/40 (Snellen) in each eye without corrective lenses or visual acuity separately corrected to 20/40 (Snellen) or better with corrective lenses, distant binocular acuity of at least 20/40 (Snellen) in both eyes with or without corrective lenses, field of vision of at least 70° in the horizontal Meridian in each eye, and the ability to recognize the colors of traffic signals and devices showing standard red, green, and amber." 49 C.F.R. § 391.41(b) (1998).

> ***whom some accommodation may be reasonable***. The job qualification it
> was applying was the distant visual acuity standard of the Federal Motor
> Carrier Safety Regulations, 49 CFR § 391.41(b)(10) (1998), ***which is made
> binding*** on Albertson's….

*Id.* at 2171 (emphasis added).

Ultimately, the Supreme Court held that an employer could use its compliance with "***clearly applicable***" regulatory standards to justify job qualification standards. However, as discussed above, the FRA's regulatory scheme providing discretion to medical examiners does not provide a "clearly applicable" standard for determining whether an engineer is safe to operate a locomotive. Regardless, the FRA does not consider the propriety of a railroad's decision…." 49 C.F.R. § 240.405(K).

### 3. *Bey does not apply*

Union Pacific again attempts to draw comparisons to a wholly inapplicable regulation—this time, Union Pacific points to the handling of an Occupational Safety and Health Administration (OSHA) "standard that prohibited firefighters from wearing beards under respirator masks." ECF No. 55, at 21, citing *Bey v. City of New York*, 999 F.3d 157 (2nd Cir. 2021). As stated by Union Pacific, "the central holding in *Bey* was that the FDNY was not required to provide an accommodation from the OSHA requirement…." ECF No. 55, at 21. Again, this is because the Second Circuit held that the OSHA regulation regarding beards was "***a binding federal safety regulation***" and "prohibit[s] the accommodation that the Firefighters seek." *Id.* at 167-68 (emphasis added). Union Pacific is mislabeling its self-imposed permanent work-restrictions placed on Cromeens—comparing binding OSHA regulations to Union Pacific's standard "sudden incapacitation" restrictions that it placed on employees "no matter what their job was". *See* PSOF ¶ 175. Union Pacific's sudden incapacitation work restrictions are not based on any binding FRA standard and are merely of its own creation, making them subject to question under the ADA.

14

**B. There is no Legitimate, Nondiscriminatory Reason for Union Pacific's Conduct and Pretext Exists**

In assuming arguendo that Cromeens could establish his prima facie case, Union Pacific attempts to jam a pretext analysis into the case by labeling its discriminatory reasons for imposing job restrictions as "legitimate" and "non-discriminatory". ECF No. 55, at 25. Here, Union Pacific's explanation for its decision to place permanent work restrictions on Cromeens is "safety risks"; more specifically, Union Pacific provides, "the reason for not certifying Cromeens is the safety risk posed by his monocular vision in combination with the multiple progressive medical conditions in his 'good' eye." *Id.*

It is well-established that any "legitimate, nondiscriminatory" reason sufficient to require Plaintiff to demonstrate pretext must be "***unrelated*** to the individual's disability." 29 C.F.R. § 1630, App. §1630.15(a) (emphasis added). A rationale that is associated with the employee's disability "is considered to be part of the disability, rather than a separate basis for termination." *Dark v. Curry Cnty.*, 451 F.3d 1078, 1084 (9th Cir. 2006); *Sanders*, 2021 WL 4783629, at *8-9, *Equal Emp. Opportunity Comm'n v. Drivers Mgmt., LLC*, No. 8:18-CV-462, 2023 WL 5627094, at *2 (D. Neb. Aug. 31, 2023). Union Pacific's rationale for its decision is not "unrelated" to Cromeens's disability, and cannot be considered a legitimate, non-discriminatory rationale to support the application of a pretext analysis. *See Sanders*, 2021 WL 4783629, *1, 8-9, *Dark*, 451 F.3d at 1084. Because Union Pacific fails to even point to a legitimate non-discriminatory rationale, its argument for summary judgment should be denied. *Patrick v. Ridge*, 394 F.3d 311, 320 (5th Cir. 2004).

Even if Union Pacific could submit a legitimate, non-discriminatory rationale for its decision, which it cannot, its argument still fails because Cromeens is able to raise a triable issue that Union Pacific's rationale is pretext for discrimination. In the Eighth Circuit, plaintiffs can establish pretext in any number of ways, including temporal proximity, a change in attitude toward

15

the employee, proof that the employer's rationale has no basis in fact, or an inconsistent application of policy, among other evidence. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-48 (2000); *see also Anderson v. KAR Glob.*, 78 F.4th 1031, 1037 (8th Cir. 2023); *E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963, 969 (8th Cir. 2014); *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010); *Hudson v. Norris*, 227 F.3d 1047, 1051 (8th Cir. 2000); *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 867 (8th Cir. 2006). Strong evidence of a prima facie case can also, by itself, present a factual issue on pretext. *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 726 (8th Cir. 2001).

Here, Cromeens is more than able to raise a jury question on pretext. Cromeens worked as a through-freight engineer for Union Pacific from August 14, 2012, until November 21, 2015. PSOF ¶ 2. Prior to that he worked various positions at Union Pacific between 1998 and 2012. *Id.* ¶¶ 97-100. In total Cromeens worked for Union Pacific for 17 years and for approximately 15 of those years, he was certified to operate locomotives. *Id.* ¶ 101. Cromeens never caused or was involved in a train accident or derailment. *Id.* ¶¶ 101-103. For much of the time prior to Union Pacific's 2015 Fitness-for-Duty review of Cromeens, Union Pacific had no concern about Cromeens's performance or qualifications. After having cataracts surgery triggering Union Pacific's Fitness-for-Duty review process, Union Pacific's medical examiner Dr. Charbonneau, reviewed medical records and documented several of Cromeens's eye conditions. *Id.* at ¶ 146. Dr. Charbonneau wrote his review on November 15, 2015, and three days later contacted Cromeens to advise him that Union Pacific was formally issuing restrictions on him. *Id.* ¶¶ 146 and 167. This demonstrated near immediate temporal proximity.

The evidence demonstrates that Union Pacific's rationale has no basis in fact. Without examining or speaking to Cromeens, Dr. Charbonneau concluded that Cromeens "has multiple

conditions in his right eye which place him at risk for sudden visual impairment." *Id.* ¶¶ 136-37, and 147. On the other hand, Cromeens's treating optometrist, Dr. Gayle Karanges concluded in the records reviewed by Dr. Charbonneau that, "[h]e is now released to return to work as his vision has been restored to a very good level in each eye." *Id.* ¶ 129. Dr. Charbonneau who made the conclusion that Cromeens eye conditions placed him "at risk for sudden visual impairment," was not an ophthalmologist, not an optometrist, and he had never completed any specialized training in ophthalmology. *Id.* ¶ 134. Union Pacific did not consult an independent ophthalmologist for review of Cromeens's case. *Id.* ¶ 143.

Although several conditions were listed in Dr. Charbonneau's review notes, a "retinal detachment" was the only specific possibility Dr. Charbonneau testified to as a potential cause of "visual system failure". *Id.* ¶ 160. Cromeens also submitted to Union Pacific a letter from Dr. Maurice Syrquin, a retina specialist who evaluated Cromeens before and after his cataract surgeries. *Id.* ¶ 208. This letter stated, "Mr. Cromeens is not having any new symptoms or presenting any new problems. In my professional opinion he is fine to continue working." *Id.* ¶ 210. Dr. Syrquin explained that the "posterior vitreous detachment" he had observed in Cromeens's eyes was a "normal finding" in patients over the age of 49, and that it was generally "non-significant." *Id.* ¶ 213. Dr. Syrquin explained that "[Cromeens] was working prior to seeing me. . . .And now he's coming to us with [] vision of 20/30 and ultimately ended up at 20/20 vision. So it would seem to me that there would be no reason why he wouldn't be able to go back to the same job he had been doing previously after correcting his vision in his right eye better than where he was before. *Id.* ¶ 217. Dr. Charbonneau disregarded Cromeens's treating physicians' recommendations that he could safely return to work. *Id.* ¶ 159.

17

Dr. Charbonneau did not identify any medical evidence in either Cromeens's medical records or in scientific studies that he considered at the time of the decision to impose permanent work restrictions on Cromeens. *Id.* ¶ 161. His testimony was that the "diagnoses ***imply*** medical and functional consequences", however, he never quantified the likelihood of Cromeens have a retinal detachment or experiencing sudden vision loss, nor did he explain how imminent such a risk might be. *Id.* ¶¶ 162-63 (emphasis added). Not only was his decision reckless and without factual support, but when imposing the restrictions, Union Pacific did not engage in a standard interactive process with Cromeens. In fact, the supervisor who signed off on the documentation stating no reasonable accommodation could be made never directly supervised Cromeens, never spoke to him, and did not know anything about his work history or job performance. *Id.* ¶¶ 179-182.

These facts demonstrate a dramatic variation from policy and law that provide at a minimum a triable issue of pretext on Cromeens's claims.

### C.  Cromeens Can Establish His Disparate Treatment Claim

Union Pacific's argument that Cromeens cannot establish a disparate treatment claim is incredibly misguided. Again, Union Pacific attempts to turn the well-established burden-shifting of the ADA on its head, contending that Union Pacific does not need to prove its direct threat defense, rather it is the Plaintiff's burden to "show Union Pacific had no reasonable basis to take the position that he was not qualified and revoke his certification." ECF No. 55, at 31. Because Unions Pacific's various efforts to shift the burden of proof to Plaintiff fall under the heading of "qualification," it is worth addressing the elements of "qualification" under the ADA.

An employee is qualified if he can perform the essential functions of his job with or without reasonable accommodation. *Sanders*, 108 F.4th at 1061 (*citing* 42 U.S.C. § 12111(8)). "The

determination of whether an individual is qualified for purposes of the ADA is a two-step process that should be made at the time of the employment decision." *E.E.O.C. v. Wal-Mart Stores,* at 566. First, courts consider whether "the individual possesses the requisite skills, education, certification or experience necessary for the job." *Id.* at 568. Second, courts consider "whether the individual can, despite [his] impairments, perform the essential functions of the job either with or without reasonable accommodation." *Id.*

Under the second inquiry, the essential functions are the "fundamental job duties" rather than the "marginal functions" of the job. *Id.*; 29 C.F.R. § 1630.2(n)(1); *Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894, 900 (8th Cir. 2006). Evidence to consider in this determination may include: "(1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 786 (8th Cir. 2004). While the employer's judgment is given deference, it "is merely evidence and is not conclusive." *Id.* When an employer disputes that the plaintiff can perform the essential functions of the job, the employer has the burden of production to come forward with evidence of those essential functions. *Wal-Mart Stores Inc.*, 477 F.3d at 568.

Instead of addressing any of the qualification standards provided for in case law, Union Pacific claims it "undoubtedly met its burden of establishing the disability is relevant to Cromeens' qualifications for the job…." ECF No. 55, at 29. And that that it had a "**SAFETY-RELATED** reason for revoking his FRA certification…." *Id.* at 18 (emphasis added). As addressed above, requiring Cromeens to prove that he can *safely* perform the essential functions of his job to

establish that he is qualified shifts the direct threat burden to Cromeens and entirely relieves Union Pacific from its burden of establishing its affirmative defense. It is well-established that any "legitimate, nondiscriminatory" reason sufficient to require Plaintiff to demonstrate pretext must be "***unrelated*** to the individual's disability." 29 C.F.R. § 1630, App. §1630.15(a) (emphasis added). This Court has stated that "the question of whether [an employee] can perform his job safely, so as to be qualified for the position is not part of a plaintiff's prima facie case but goes to whether the Railroad can prevail on its direct threat defense." *See Sanders v. Union Pac. R.R. Co.*, 2021 WL 4783629, at *8-9 (D. Neb. Oct. 7, 2021).

When it comes to whether Cromeens "possesses the requisite skills, education, certification or experience necessary for the job," he assuredly does. In total Cromeens worked for Union Pacific for 17 years, and for approximately 15 of those years, he was certified to operate locomotives. PSOF, ¶ 101. Cromeens never caused or was involved in a train accident or derailment and does not recall ever being formally disciplined by Union Pacific. *Id.* ¶¶ 101-103. During his career Cromeens took and passed approximately 49 different "skills exams" failing none—routinely achieving perfect 100/100 score on these exams. *Id.* ¶ 105. There is no question that Cromeens could do the job. In fact, Union Pacific's position related to his eye conditions is not that he was unable to do the job, rather he was "***at risk*** for sudden visual impairment." *Id.* ¶ 147 (emphasis added). Dr. Charbonneau never quantified the likelihood of Cromeens having a retinal detachment or experiencing sudden vision loss, nor did he explain how imminent such a risk might be. *Id.* ¶¶ 162-63. Simply put, Cromeens could perform the essential functions of his job.

### III.    CROMEENS CAN ESTABLISH DISABILITY DISCRIMINATION UNDER 42 § 12112(B)(6)

#### A. Cromeens Can Establish a Prima Facie Claim That He Was Screened Out By Unlawful Qualification Standards

Cromeens can prove his prima facia case of unlawful screening by establishing that Union Pacific screened ***him*** out on the basis of a disability using its Fitness-for-Duty program. *See Brasier v. Union Pacific Railroad. Co.*, 2023 WL 2754007, at *11 (citing *Rohr v. Salt River Project Agric. Imp. & Power Dist.*, 555 F.3d 850, 863 (9th Cir. 2009); *Gonzalez v. City of New Braunfels*, 176 F.3d 834, 839 n.26 (5th Cir. 1999)) (emphasis added). Cromeens "need not prove his prima facie case with evidence, statistical or otherwise, showing a large impact on a group of people with a disability." *Id.*

Cromeens has established a prima facie case of unlawful screening because it is undisputed that Union Pacific applied its standard "sudden incapacitation" work restrictions that Union Pacific applied to employees that it "thought had an unacceptable risk for sudden incapacitation because of some medical condition." PSOF, ¶ 173. These "sudden incapacitation" restrictions were placed on employees "no matter what their job was". *See id.* ¶ 175. In working with Union Pacific's Labor Relations and Legal departments, Union Pacific adopted these standardized work restrictions. *Id.* ¶ 174. Union Pacific imposed the same restrictions regardless of a person's job because Union Pacific "didn't want to say that they can't do this particular job. We'd have . . . to have a list of, you know, 200, jobs, which is unwieldy." *Id.* ¶ 175. From here, these restrictions were reviewed by Union Pacific's General Superintendent in Fort Worth, Texas, Kurt Zalar, for the purpose of deciding whether the restrictions could be accommodated in Cromeens's position as a locomotive engineer. *Id.* at ¶ 179. Zalar did not know who Cromeens was, had never worked with Cromeens, never directly supervised him, never spoke to him, and did not know anything about Cromeens's

21

work history or job performance. *Id.* at ¶ 181. Zalar filled out Cromeens's restriction review form indicating that reasonable accommodation could not be made for Cromeens's work restrictions. *Id.* at ¶ 182. Ultimately, Union Pacific advised Cromeens that it had placed permanent work restrictions on him, and that Union Pacific could not accommodate his restrictions to allow him to return to his engineer position. *See* Defendant's Statement of Material Facts at ¶ 58.

### B. Union Pacific's Use of a Facially Discriminatory Qualification Standard was not Justified by Business Necessity

Union Pacific cannot rely on the affirmative defense of "business necessity" to justify its sudden incapacitation work restrictions. To establish this affirmative defense of business necessity, Union Pacific "bears the burden of showing that the qualification standard is: (1) 'job-related,' (2) 'consistent with business necessity,' and (3) that 'performance cannot be accomplished by reasonable accommodation.'" *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 995 (9th Cir. 2007) quoting 42 U.S.C. § 12113(a)); *see also Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir. 2001) (holding that the employer bears the burden of proof on the business necessity defense). "Application of the business necessity defense is fact-intensive and requires close analysis by the district court." *Bates*, 511 F.3d at 997 n.14. Triable issues still exist on all three elements of Union Pacific's business necessity defense.

First to show that its qualification standard is "job-related," Union Pacific must demonstrate that it "fairly and accurately measures the individual's actual ability perform the essential functions of the job." *Id.* at 996. Union Pacific cannot show that it fairly and accurately measured Cromeens's actual ability to perform the essential functions of his job. Dr. Charbonneau did not identify any medical evidence in either Cromeens's medical records or in scientific studies that he considered at the time of the decision to impose permanent work restrictions on Cromeens to support his contention that Cromeens was at risk of having a retinal detachment or experiencing

22

sudden vision loss, other than the diagnoses themselves. PSOF, ¶ 161. His testimony was that the "diagnoses *imply* medical and functional consequences", however, Dr. Charbonneau never quantified the likelihood of Cromeens having a retinal detachment or experiencing sudden vision loss, nor did he explain how imminent such a risk might be. *Id.* ¶¶ 162-63. At no point did Dr. Charbonneau examine or speak to Cromeens before making a determination on his Fitness-for-Duty case. *Id.* ¶¶ 136-37.

Second, to show that its qualification standards are "consistent with business necessity," Union Pacific must show that is "substantially promote[s]" its business needs. *Bates*, 511 F.3d at 996 (citing *Cripe*, 261 F.3d at 890). "The 'business necessity' standard is quite high, and is not to be confused with mere expediency." *Id.* "For a safety-based qualification standard, '[i]n evaluation whether the risks addressed by . . . [the] qualification standard constitute a business necessity, the court should take into account the magnitude of possible harm as well as the probability of occurrence.'" *Id.* (quoting *E.E.O.C. v. Exxon Corp.*, 203 F.3d 871, 875 (5th Cir. 2000)). Union Pacific cannot demonstrate the magnitude of possible harm or the probability of occurrence because it did not quantify those factors at the time of its decision and has offered no rebuttal to the testimony of Dr. Neitz, who provided that retinal detachments are rare, "with only about 1 in 10,000 incidents." PSOF, ¶¶ 162-63, 244. Further, Dr. Neitz testified that posterior vitreous detachment "is a normal part of aging, so this is something that . . . everybody that works for the railroad, . . . if they stay working long enough," will experience, "and it's just generally not an issue." *Id.* ¶ 245. In all, Dr. Neitz testified that the likelihood of Cromeens having a retinal detachment was extremely low, and Cromeens would be aware of any warning signs of a retinal detachment and could have sought treatment in a timely manner—importantly, the type of retinal

detachment most commonly associated with Cromeens's conditions progresses over "days to weeks". *Id.* ¶¶ 248-49.

Third, to show that "performance cannot be accomplished by reasonable accommodation," Union Pacific must demonstrate "either that no reasonable accommodation currently available would cure the performance deficiency or that such reasonable accommodation poses an 'undue hardship.'" *Bates*, 511 F.3d at 996097; *see also Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 699 (7th Cir. 1998) ("Even when 'physical fitness' is a selection criterion that is related to an essential function of the job, however, it 'may not be used to exclude an individual with a disability *if that individual could satisfy the criteri[on] with the provision of a reasonable accommodation*.'" (quoting 29 C.F.R. Pt. 1630, App. § 1630.10)). Union Pacific cannot demonstrate that no reasonable accommodation exists which "would cure the performance deficiency" because it did not even consider whether reasonable accommodations existed until after it imposed work restriction on Cromeens. PSOF, ¶ 179. It then arbitrarily concluded that accommodations are not available because the standard restrictions it imposes invariably prohibit employees from performing job duties listed in their job descriptions. *Id.* ¶ 181.

Nevertheless, the EEOC's interpretative guidance states that:

> With regard to safety requirements that screen out or tend to screen out an individual with a disability . . . an employer must demonstrate that the requirement, as applied to the individual, satisfies the "direct threat" standard in § 1630.2(r) in order to show that the requirement is job-related and consistent with business necessity.

29 C.F.R. Pt. 1630, App. § 1630.15(b)-(c). As addressed below, Union Pacific cannot establish its "direct threat" defense.

**IV.    UP Cannot Establish a "Direct Threat" Defense**

Union Pacific's claim that Cromeens was a safety risk is properly analyzed as part of its "direct threat" affirmative defense. The direct threat defense requires an employer to prove that an employee poses a "significant risk of substantial harm to the health or safety of the individual or other that cannot be eliminated or reduced by reasonable accommodation." *Sanders*, 108 F.4th at 1062 (*citing* 42 U.S.C. §§ 12111(3)). Union Pacific must show "that its determination that [Cromeens] posed a direct threat was: (1) the result of an individualized assessment, (2) objectively reasonable, and (3) based on the most current medical knowledge and/or on the best available objective evidence." *Id*. Whether an employee poses a direct threat "is a complicated, fact intensive determination . . . for the trier of fact to determine after weighing all of the evidence about the nature of the risk and the potential harm." *Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 764 (5th Cir. 1996); *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1278 (10th Cir. 2015); 29 C.F.R. § 1630.2(r). For this reason, the direct threat defense is rarely a question of law. *Rizzo*, 84 F.3d at 764; *see also Jacobs v. N.C. Administrative Office of Courts*, 780 F.3d 562, 569 (4th Cir. 2015). (reversing district court where district court "improperly resolved factual issues at the summary judgment stage").

**A. Union Pacific's Permanent Sudden Incapacitation Work Restriction Were Not Reasonably Based on Objective Medical Evidence**

Union Pacific cannot show that its decision to impose permanent work restrictions on Cromeens was based on a reasonable medical judgment that relied on the most current medical knowledge and on the best available evidence. Initially, Dr. Charbonneau's opinions are not entitled to any special deference merely because he is a physician, even if he made his decisions in good faith (which Cromeens disputes). *See Bragdon v. Abbot*, 524 U.S. 624, 649-50 (1998).

25

Dr. Charbonneau was not an ophthalmologist or an optometrist, nor had he completed any specialized training in ophthalmology. PSOF, at ¶ 134. Union Pacific did not consult an independent ophthalmologist for review of Cromeens's case. *Id.* ¶ 143. Dr. Charbonneau did not consult with Cromeens's treating physicians and disregarded Cromeens's treating physicians' recommendations that he could safely return to work. *Id.* ¶ 159. Ultimately, Dr. Charbonneau did not identify any medical evidence in either Cromeens's medical records or in scientific studies that he considered at the time of the decision to impose permanent work restrictions on Cromeens or to support his contention that Cromeens was at risk of having a retinal detachment or experiencing sudden vision loss, other than the diagnoses themselves. *Id.* ¶ 161.

## B. Union Pacific Failed to Make a Reasonable Individualized Assessment and Cannot Establish the § 1630.2(r) Factors

Union Pacific's direct threat defense fails because it cannot show that it made an "individualized assessment" of Cromeens's "present ability to safely perform the essential functions of the job." 29 C.F.R. § 1630.2(r). In determining whether an employee would post a direct threat, the factors considered must include: "(1) the duration of the risk; (2) the nature and severity of the potential harm: (3) the likelihood that the potential harm will occur; and (4) the imminence of any potential harm." *Id.* Cromeens performed his job for 17 years with no train accidents or derailments and does not recall ever being formally disciplined for any reason, let alone a safety rule violation. PSOF, ¶¶ 101-103. Union Pacific's assessment of Cromeens's actual conditions were not individualized nor did they assess his present ability to perform the job because Dr. Charbonneau based his decision simply on what Cromeens's "***diagnoses imply***." *Id.* ¶¶ 162-63 (emphasis added). Importantly, the decision was not based on Cromeens's actual condition, rather on his "diagnoses"—this is reinforced by the fact that Union Pacific never quantified the likelihood of Cromeens to have a retinal detachment or experiencing sudden vision loss, nor did Union Pacific

26

provide how imminent such a risk might be. *Id.* An employer's subjective belief that a "significant risk exist[s], even if maintained in good faith, does not relieve him of liability." *Bragdon v. Abbott*, 524 U.S. 624, 649-50, 118 S.Ct. 2196 (1998). A "slightly increased risk is not enough to constitute a direct threat, there must be a high probability of substantial harm." *E.E.O.C. v. Hibbing Taconite Co.*, 720 F. Supp. 2d 1073, 1082 (D. Minn. 2010); *see also* 29 C.F.R. § 1630, App. § 1630.2(r).

Ultimately, the likelihood of Cromeens having a retinal detachment was extremely low, and Cromeens would be aware of any warning signs of a retinal detachment and could have sought treatment in a timely manner—importantly, the type of retinal detachment most associated with Cromeens's conditions progresses over "days to weeks". PSOF, ¶¶ 248-49. Moreover, Union Pacific did not impose individualized work restrictions on Cromeens, rather its standard "sudden incapacitation" restrictions that it placed on employees "no matter what their job was". *See* PSOF ¶ 175.

## CONCLUSION

Union Pacific imposed four permanent job restrictions on Cromeens based on nothing more than what his diagnoses implied. In Cromeens's case, Union Pacific never even quantified the likelihood of him having sudden vision loss. The restrictions were not individualized to Cromeens, rather the restrictions were part of Union Pacific's standard sudden incapacitation restrictions it placed on all employees that fell under a category of having "an unacceptable risk for sudden incapacitation." Union Pacific's medical director testified that standard restrictions were imposed because it would be too "unwieldy" to make individual assessments for employees. Now, Union Pacific is attempting to pass off its own standard sudden incapacitation restrictions as "final agency action." In summary, Union Pacific's purported facts are unsupported and disputed. Subject matter jurisdiction for this case squarely falls with this Court. Cromeens has established each element of

his prima facie case and Union Pacific is unable to meet its burden for its direct threat affirmative

defense, therefore, this Court should deny Union Pacific's motion for summary judgment.

Date: January 31, 2025                **NICHOLS KASTER, PLLP**

                                                    s/ Cyle A. Cramer
                                                    James H. Kaster* (MN #53946)
                                                         kaster@nka.com
                                                    Lucas J. Kaster* (MN #396251)
                                                         lkaster@nka.com
                                                    Cyle A. Cramer* (MN #0402644)
                                                         ccramer@nka.com
                                                    80 South Eighth Street
                                                    4700 IDS Center
                                                    Minneapolis, MN  55402-2242
                                                    Telephone: (612) 256-3200
                                                    Fax: (612) 338-4878

                                                    *Admitted in D. Neb.

                                                    **ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with NECiv 7.1(d) and further verify that the word count function was applied to include all text, including the caption, headings, footnotes, and quotations. This document was prepared using Microsoft 365 and contains 8,549 words.

I also hereby certify that no generative artificial intelligence program was used in drafting this document.

<u>s/ Cyle A. Cramer</u>
Cyle A. Cramer

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing was sent via

CM/ECF on January 31, 2025 to the following:

Scott P. Moore
spmoore@bairdholm.com

Addison McCauley
amccauley@bairdholm.com

<u>s/ Cyle A. Cramer</u>
Cyle A. Cramer