IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| GAYLON CROMEENS,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>UNION PACIFIC RAILROAD CO.,<br><br>　　　　Defendant. | 8:23CV234<br><br>**MEMORANDUM AND ORDER** |

Before the Court is Union Pacific Railroad Company's Motion for Summary Judgment. Filing No. 54.

Gaylon Cromeens worked for Union Pacific as a locomotive engineer. Cromeens had poor vision in his left eye from the day he joined the company and did not meet the eyesight requirements promulgated by the Federal Railroad Administration (FRA). Nevertheless, Union Pacific concluded Cromeens could safely operate a locomotive, and he did so without incident starting in 2011. That changed in 2015, when his ophthalmologist noted multiple conditions in his right eye after cataracts surgery. No longer confident that Cromeens could safely operate a locomotive, Union Pacific pulled him from service, citing his inability to meet the FRA requirements for certification.

Cromeens claims this violated the Americans with Disabilities Act (ADA). But, in these circumstances, the FRA provides an administrative review procedure. Cromeens did not use this procedure, so the agency never had a chance to decide whether Union Pacific properly applied its regulations. Accordingly, the Court finds Union Pacific is entitled to summary judgement based on Cromeens's failure to exhaust.

I.  **BACKGROUND**

This is an ADA case in which Union Pacific removed Cromeens—a train engineer—from service because of his eyesight.

Cromeens worked at Union Pacific for over two decades. He started his career as a switchman/brakeman in 1998. Filing No. 58-1 at 4. He worked as a through-freight engineer from 2011 to 2015. Id. at 4–5; Filing No. 58-8 at 2. Cromeens was never involved in an accident during his employment with Union Pacific. Filing No. 58-8 at 20.

The engineer drives the train. Filing No. 58-1 at 5–6. While driving the train, the engineer monitors the trains surroundings, steers the train, brakes the train at stoplights, and brings the train to an emergency stop if there is a hazard in the track. Id. at 6–7. Everyone agrees an engineer needs good vision to safely perform the functions of the job. Id. at 5–6. An engineer must keep close watch over the area surrounding the train and keep track of signs, signals, and possible hazards in the path of the train. Id. If an engineer were to disregard a sign, misread a signal, or miss a hazard in the track the consequences could be severe. See id. That is why the Federal Railroad Administration promulgated vision requirements for train engineers. The Court will discuss these requirements in detail *infra* Section A.

Cromeens has a long history of vision problems. Filing No. 58-26 at 2; Filing No. 58-1 at 8–9. Since birth, he has suffered from a condition called "retinopathy of prematurity." Filing No. 58-26 at 2. Basically, Cromeens was born prematurely and his eyes developed "abnormal growth of blood vessels in the retina." Id. This condition is more pronounced in his left eye. Filing No. 58-1 at 9; Filing No. 58-26 at 2–3. In 2014, the best corrected visual acuity in Cromeens's left eye was 20/400 (Snellen). Filing No.

58-12 at 1. After cataract surgery, his corrected left eye visual acuity was 20/200 (Snellen). Filing No. 58-9 at 7–8. In other words, even with glasses or contacts, Cromeens needs to be 20 feet away to see the level of detail a person with perfect vision could see at 200 feet away. This level of vision is very poor, and Union Pacific treated him as "functionally monocular." Filing No. 58-9 at 8; Filing No. 58-3 at 4, 8–9; Filing No. 58-2 at 4–5.

Union Pacific learned of Cromeens's vision problems early on. Starting in 2011, Cromeens worked as an engineer. Filing No. 58-1 at 4. In 2014, Cromeens failed the vision test in his left eye, but had adequate vision in his right eye and overall. Filing No. 58-9 at 12. Despite Cromeens not meeting the FRA standards in his left eye, Union Pacific's medical staff concluded he could be certified as an engineer because his vision in his right eye could be corrected to 20/40 or better and the eye had no other conditions affecting vision. *Id.* This was consistent with the approach Union Pacific used for monocular engineers—certifying them as long as there were no problems with the "good eye." *See id.* Union Pacific required Cromeens to submit to annual monitoring of his vision. Filing No. 58-13; Filing No. 58-14.

In 2015, Cromeens developed cataracts that impaired his vision in the right eye, his better eye. Filing No. 58-1 at 12. His treating optometrist recommended surgery to remove the cataracts. Filing No. 58-15 at 4. Cromeens requested, and was granted, medical leave to undergo the surgery. Filing No. 58-16 at 1. The operation was a success. Cromeens's left eye visual acuity improved to 20/200 (Snellen) and his right eye was corrected to 20/20 (Snellen). Filing No. 58-21 at 3. Moreover, the operation improved his overall field of vision and allowed him to wear glasses with thinner lenses,

3

improving his peripheral vision. Filing No. 58-21 at 6–7; Filing No. 58-7 at 10. In other words, Cromeens's vision was better post-surgery, but still did not meet the FRA requirements for engineer certification.

Before returning to work, Union Pacific required Cromeens to undergo a fitness for duty examination wherein the company doctor reviewed Cromeens's vision and decided whether Cromeens could safely return to his job as an engineer. Filing No. 58-16 at 1; Filing No. 58-9 at 8. Union Pacific did not let Cromeens return to work following the fitness for duty evaluation. Filing No. 58-9 at 8. Dr. John Holland, Union Pacific's Medical Examiner, and Dr. John Charbonneau, Associate Medical Director, concluded that, while Cromeens's overall vision improved, his surgery records revealed previously undisclosed issues in the right eye.[1] *Id.* at 7. More specifically, his treating optometrist noted: (1) "Bilateral keratoconus, so his 'good' eye has an additional ongoing condition"; (2) "Right eye with temporal retinal scarring"; (3) "Macular changes in the right eye"; (4) "Posterior vitreous detachment in both eyes"; and, (5) "His best corrected [visual acuity] at the time of the most recent exam was Right 20/20 and Left 20/200." Filing No. 58-9 at 7–8. As a result, Dr. Charbonneau concluded Cromeens did not meet the requirements for FRA certification and imposed work restrictions that prevented Cromeens from working as a train engineer. *Id.* at 7. Dr. Charbonneau maintained the restrictions after Cromeens provided additional information, reasoning the extra information from his treating providers did not change the risk posed by his various ocular impairments. *Id.*

---

[1] Union Pacific's reconsideration appears to have also been motivated by policy level changes, as well as changes to Cromeens's visual acuity. More specifically, in 2015, Union Pacific was under fire from regulators after an accident in which NSTB investigators determined the engineer's poor vision was one of the reasons for the accident.

Cromeens did not challenge Dr. Charbonneau's decision in front of the FRA. Instead, he brought this lawsuit. The Court has jurisdiction under 28 U.S.C. § 1331.

## II.   LEGAL STANDARD

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that "an adverse party cannot produce admissible evidence to support" a fact essential to the nonmoving party's claim. Fed. R. Civ. P. 56(c)(1)(A) & (B). The plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

"The movant 'bears the initial responsibility of informing the district court of the basis for its motion, and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Celotex Corp., 477 U.S. at 323). If the movant does so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" Id. (quoting Celotex Corp., 477 U.S. at 324). A "genuine" issue of material fact exists "when there is sufficient evidence favoring the party opposing the motion for a jury

5

to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

The evidence must be viewed in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003). "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations." *Id.* "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004). If "reasonable minds could differ as to the import of the evidence," summary judgment should not be granted. *Anderson*, 477 U.S. at 251.

## III.   DISCUSSION

The parties raise many difficult issues about the interplay between generally applicable safety regulations and the ADA but one is dispositive: Cromeens's failure to challenge Union Pacific's certification decision with the FRA.[2]  The Court's analysis is guided by the Eighth Circuit's decision in *Harris v. P.A.M. Transp. Inc.*, 339 F.3d 635, 638 (8th Cir. 2003), which addressed a similar claim arising under a similar administrative scheme.

---

[2] Alternatively, Union Pacific argues that jurisdiction is exclusive with the Eighth Circuit rather than this Court under the Hobbs Act.  *See* 28 U.S.C. § 2342(7) (allowing for review of final agency decisions of the Secretary of Transportation in the applicable court of appeals).  The Eighth Circuit has not addressed this argument, and other courts addressing this issue are split.  *Compare Turner v. BNSF R.R. Co.*, 138 F.4th 224 (5th Cir. 2025) (suggesting jurisdiction over these kinds of claims is exclusive with the Circuit Court), *with DeFries v. Union Pac. R.R. Co.*, No. 3:21-cv-205, 2025 WL 1029283 (D. Or. Mar. 7, 2025) (holding the FRA process does not preclude an ADA claim).  However, because no exhaustion occurred here, the Court need not decide whether the availability of this review precludes an ADA claim in the district court.

### A. The FRA's Vision Requirements

The railroad industry is heavily regulated and for good reason. Rail transport relies on huge machines carrying everything from passengers to toxic chemicals. A train derailment is dangerous, disruptive, and expensive. So, Congress delegated authority to the Federal Railroad Authority to "prescribe regulations and issue orders for every area of railroad safety." 49 U.S.C. § 20103(a); 49 C.F.R. § 1.49.

Among other topics, the FRA has promulgated detailed regulations addressing the qualification and certification requirements for locomotive engineers. 49 C.F.R. pt. 240. Specifically, the regulations provide, "Each railroad subject to this part shall have in effect a written program for certifying the qualifications of locomotive engineers." 49 C.F.R. § 240.101.³ If a railroad fails to comply, i.e. allows an ineligible person to work as an engineer, the FRA may impose civil penalties. *Id.* § 240.11. Basically, the FRA delegated authority to the individual railroad to certify its employees are qualified to work as engineers and, as discussed in detail below, provided for agency review on the back end.

This case involves the FRA's vision requirements. Union Pacific is required to "have a certification program . . . that includes . . . [a] procedure for evaluating visual . . . acuity." 49 C.F.R. § 240.101(c)(4). Relevant here, the distance viewing thresholds are "either . . . [d]istant visual acuity of at least 20/40 (Snellen) in each eye without corrective lenses . . . or [d]istant visual acuity separately corrected to at least 20/40 (Snellen) with corrective lenses and distant binocular acuity of at least 20/40 (Snellen) in both eyes with or without corrective lenses." *Id.* § 240.121(c)(1). If an engineer does not meet the distance vision threshold, the regulations provide for further review by the railroad's

---

³ Union Pacific, a national railroad, is covered by these regulations. *See* 49 C.F.R. § 240.3(a).

medical examiner. Specifically, "upon request" the "railroad's medical examiner" evaluates the engineer "to determine that person's ability to safely operate a locomotive." *Id.* § 240.121(e). And, "[i]f, after consultation with one of the railroad's designated supervisors of locomotive engineers, the medical examiner concludes that, despite not meeting the [distance] threshold . . . the person has the ability to safely operate a locomotive, the person may be certified as a locomotive engineer." *Id.* In other words, the regulations set strict vision standards but provide a discretionary exemption for situations where the medical examiner concludes literal adherence to the vision standards is unnecessary to ensure safety.

If a railroad declines to certify or withdraws certification, the engineer may seek review from the FRA. Specifically, an engineer who has been "denied certification, denied recertification, or has had his or her certification revoked and believes that a railroad incorrectly determined that he or she failed to meet the certification requirements of this part when making the decision to deny or revoke certification, may petition the Federal Railroad Administrator to review the railroad's decision." 49 C.F.R. § 240.401(a). Initially the appeals are decided by the Operating Crew Review Board. *Id.* § 240.401(b). "The Board will determine whether the denial or revocation of certification or recertification was improper under this part (i.e., based on an incorrect determination that the person failed to meet the certification requirements of this part)." *Id.* § 240.405(k). In making that decision, the Board considers whether the railroad relied on "medically and legally legitimate" testing procedures and "provide[d] an honest and fully informed evaluation" of the employee. "The Board will not otherwise consider the propriety of a railroad's decision, i.e., it will not consider whether the railroad properly applied its own more

stringent requirements" or whether the railroad complied with applicable collective bargaining agreements. 49 C.F.R. § 240.405(k).

If the Board disagrees with the engineer, the regulations provide for further review within the agency. "Any party aggrieved by the presiding officer's decision" (i.e., either the engineer or the railroad) "may file an appeal in the presiding officer's docket." Id. § 240.411(a). If the Administrator affirms, the engineer may seek review from the regional circuit court. Id. § 240.411(e) (decision of the Administrator is a "final agency action"); 28 U.S.C. § 2342(7) (providing circuit court jurisdiction over "final agency actions" of the Department of Transportation).

These regulations create a problem for Cromeens: he did not utilize the administrative review procedure to challenge Union Pacific's medical decision. The Court turns to that issue next.

## B. Exhaustion of Administrative Remedies

Union Pacific is entitled to summary judgment because Cromeens did not exhaust his administrative remedies with the FRA.

"There is a 'long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'" *Harris v. P.A.M. Transp. Inc.*, 339 F.3d 635, 638 (8th Cir. 2003) (quoting *Myers v. Bethlehem Shipbuilding Co.*, 303 U.S. 41, 50–51 (1938). Exhaustion allows the agency to "bring its expertise to bear upon the matter; it can evaluate the evidence; it can make an initial determination; and, in doing so, it can, through informed discussion and analysis, help a court later determine whether its decision exceeds the leeway that the law provides." *INS v. Ventura*, 537 U.S. 12, 17

9

(2002). So, if Congress or the agency provides an administrative forum for resolving a dispute, a federal court should generally hold off and let the agency go first—especially when the agency has specialized expertise that can aid the court in its resolution of scientific or technical issues.

Cromeens's ADA claim falls within the scope of the FRA's administrative review procedure, so the agency should make the determination in the first instance. Cromeens was required to pursue administrative remedies before coming to federal court if the issues in the suit "fall[] squarely within the regulatory scheme (and substantive expertise) of DOT." Harris, 339 F.3d at 638.

Harris is instructive. There, like here, the Court addressed a dispute between a driver (there a truck driver, here a train engineer) and a common carrier (there a trucking company, here a railroad) over the driver's physical qualifications. Id. at 638. There, like here, the Department of Transportation—acting under a delegation from Congress—required the driver to meet certain physical thresholds as assessed by the common carrier's medical director. Id. And, there, like here, the applicable regulations provided for review by the agency if the common carrier determined the driver did not meet the regulatory standard. Id. Under those circumstances "[t]he DOT is charged with and is much better equipped to handle resolution of disputes over a driver's medical qualifications and can do so far more expertly and efficiently than a reviewing court." Id. Same here. The FRA's administrative process is design to resolve this exact situation: a dispute between an engineer and a carrier about whether the engineer can be certified. 49 C.F.R. § 240.405(k). The FRA knows the regulations, the science, and the realities of

the railroad industry better than the Court. So, the FRA should review Cromeens's dispute with Union Pacific in the first instance.

This failure to exhaust matters. As noted in *Harris*, whether the employee met government-mandated safety regulations is necessary to decide whether that employee is a "qualified individual with a disability," an element of his ADA claim. *Id.* at 638–39. Specifically, where the agency has promulgated generally applicable safety requirements, that "limit[s] application of the ADA as a matter of law." *Id.* (quoting *Alberson's Inc. v. Kirkingburg*, 527 U.S. 555, 570 (1999)). Here, Union Pacific cannot employ Cromeens as an engineer unless he meets the FRA vision requirements or "the medical examiner concludes that, despite not meeting the" distance "threshold . . . [Cromeens] has the ability to safely operate a locomotive." 49 C.F.R. § 240.121(e). On this record, without an FRA determination that the medical examiner got it wrong, Cromeens can show neither. "Thus, [The Court] cannot reach [Cromeens's] ADA claim until the question of his physical qualification is resolved pursuant to the DOT procedures." *Harris*, 339 F.3d at 639.

Everyone agrees that Cromeens did not utilize the FRA procedures for challenging Dr. Charboneau's medical judgment. Instead, he filed this suit in federal court. This "precludes [Cromeens] from obtaining review of his ADA claim in federal court." *Id.* at 638.

Resisting this conclusion, Cromeens raises three arguments. None persuade.

*First*, he argues Union Pacific did not revoke or refuse to certify him, so it did not trigger a duty to exhaust. The Court cannot agree. Union Pacific specifically tied its work restrictions, which removed Cromeens from the role as engineer to his failure to meet the FRA's certification requirements. *See* Filing No. 58-9 at 3 (listing "Does not meet Federal

11

Railroad Administration (FRA) medical standards as a locomotive engineer (permanent)" as one of Cromeens's restrictions). And, while Union Pacific could have been clearer, as a practical matter the combination of determining Cromeens did not meet the FRA standards and removing him from service had the impact of a denial to recertify Cromeens. Moreover, at the time of his certification in 2014, Union Pacific conditioned his continued certification on satisfactory annual vision reviews. *See* Filing No. 58-9; 49 C.F.R. § 240.121(e) ("[T]he person may be certified as a locomotive engineer and *such certification conditioned on any special restrictions the medical examiner determines in writing to be necessary.*" (emphasis added)). Additionally, the regulations require notification by the engineer, if the engineer's vision "deteriorated to the extent that the person no longer meets one or more of the prescribed vision or hearing standards or requirements of this section," thus contemplating a railroad's ability to revisit a certification decision after certifying an engineer. 9 C.F.R. § 240.121(f). So, the FRA procedures were available to Cromeens under these circumstances.

*Second*, Cromeens argues that the FRA regulations here are different from the FMCSA regulations at issue in *Harris* and any comparison is like comparing "apples to airports." The Court disagrees. As discussed above, the features of the FMCSA regulations that drove the decision in *Harris* are present in the FRA regulations here. Cromeens attempts to distinguish *Harris* by arguing the FRA regulations here, unlike the FMCSA regulations there, delegate the decision to certify notwithstanding the engineer's poor eyesight to the railroad's medical examiner. *See* 49 C.F.R. § 240.121(e). This is a distinction without a difference. The FRA's delegation of initial decision-making authority to a medical examiner does not distinguish this case—the FMCSA regulations in *Harris*

12

also relied on private medical examiners to make initial eligibility findings. *See* 49 C.F.R. § 391.41(a) (2003). Nor does the possibility of an individualized exception matter to the Court's findings. The FMCSA "may grant a waiver that relieves a person from compliance in whole or in part" with the truck driver safety rules "if the Secretary determines that it is in the public interest to grant the waiver and that the waiver is likely to achieve a level of safety that is equivalent to, or greater than, the level of safety that would be obtained in the absence of the waiver." 49 U.S.C. § 31315(e) (2003). So, the two features of the FRA regulations Cromeens points to here were present in *Harris* and do not mandate a different outcome alone or in combination.

*Third*, citing an agency decision in which the FRA declined to address a claim of "disparate treatment" he argues that the FRA would not have been able to address his ADA claim.[4] Filing No. 69-3 at 5. Cromeens's argument may have some force in a traditional anti-discrimination action. For example, if he alleged that Union Pacific's determination was driven by his race, sex, or age, that factual question would fall outside the agency's competence. But Cromeens's case differs from a garden-variety discrimination case. Here, everyone agrees Union Pacific acted *because of* Cromeens's eyesight. So, the hard questions are whether Cromeens is a qualified individual under the applicable regulations and whether Union Pacific exercised a reasonable medical judgment after undertaking an individualized inquiry applying the best available medical information. *See* 42 U.S.C. § 12112(a) ("qualified individual"); *Sanders v. Union Pac. R.R.*

---

[4] Cromeens's attempt to frame this as a labor issue outside the scope of the FRA's authority is unavailing. Cromeens relies only on the ADA and does not claim that the work restrictions violated any provision of the applicable collective bargaining agreement. Moreover, even if this were really a collective bargaining dispute in disguise, it still would not belong in federal court. That is because the Railway Labor Act (45 U.S.C. § 153(i)) requires such "minor labor disputes" to be abitrated in front of the National Railroad Adjustment Board or private Public Law Board.

Co., 108 F.4th 1055, 1060 (8th Cir. 2024) (direct threat standard where employer acknowledges relying on employee's disability). Indeed, the thrust of Cromeens's suit is that Union Pacific's medical staff got it wrong, and he was actually safe to work. Compare that inquiry to the administrative proceedings in which the FRA assess whether the railroad relied on "medically and legally legitimate" testing procedures and "provide[d] an honest and fully informed evaluation" of the employee. Filing No. 69-4 at 15; 49 C.F.R. § 242.7. If Union Pacific relied on stale science, misunderstood his doctors' opinions, or ignored crucial aspects of Cromeens's medical condition, the FRA could correct those errors. Indeed, in the very opinion cited by Cromeens, the Board considered the merits of a claim that the railroad failed to listen to his treating providers and removed him from service despite a spotless career with colorblindness. So, while the FRA may not be able to resolve the mine run of disparate treatment claims, it can certainly resolve the key issues for *this* disparate treatment claim.

To summarize: Cromeens disagrees with Union Pacific's medical judgment that he did not meet the FRA vision requirements. The FRA provides a forum for that dispute, which Cromeens did not utilize. The agency's judgment would help resolve many of the key issues in this case. Union Pacific is entitled to summary judgment based on Cromeens's failure to exhaust.

## IV.   CONCLUSION

The Court is sympathetic to Cromeens's situation but this dispute—over the application of FRA safety rules—belongs in front of the FRA in the first instance.

THEREFORE, IT IS ORDERED:

1. Union Pacific's Motion for Summary Judgment, Filing No. 54, is granted.

2. The Court will enter a separate judgment.

Dated this 18th day of September, 2025.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge